## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DISTRICT OF COLUMBIA COUNCIL OF THE BLIND, a non-profit organization, QUDSIYA NAQUI, KEVIN ANDREWS, GERALD BARNES, RAY SMITH, and CLAIRE STANLEY, on behalf of themselves and a class of those similarly situated,<br><br>                    Plaintiffs,<br><br>        v.<br><br>DISTRICT OF COLUMBIA,<br>400 6th Street, NW,<br>Washington, D.C. 20001,<br><br>                    Defendant. | Case No. 1:25-cv-01694<br><br>**COMPLAINT** |

## INTRODUCTION

1.      Blind pedestrians in the District of Columbia ("D.C." or the "District") cannot safely cross the vast majority of signalized intersections in the District. While the District has installed visual pedestrian signals at more than 1,600 intersections to ensure the safety of its sighted pedestrians, only a fraction of those intersections have devices with auditory, tactile, and vibrotactile cues—Accessible Pedestrian Signals ("APS")—to make them accessible to blind pedestrians. Equally problematic, the modest number of signals equipped with APS are plagued by installation and maintenance issues. This class action lawsuit challenges the District's practice of systemically failing to provide blind[1] pedestrians full and equal access to its pedestrian signals program.

---

[1] Plaintiffs use the term "blind" pedestrians to describe individuals who have low or no use of vision, including people who are legally or completely blind and people who are deaf-blind.

2.     Without APS, tens of thousands of blind pedestrians who live in, work in, or visit the District are left to guess whether it is safe to cross the street. In the absence of functional APS devices, it is common for blind pedestrians to travel significantly out of their way to avoid the noisiest, busiest, and most dangerous intersections, wait alone at intersections for several cycles until other pedestrians arrive, start crossing the street only to be pulled back or shouted at by others, or avoid pedestrian travel altogether by paying for transportation or staying home.

3.     In addition to endangering blind pedestrians, these experiences demean them by compromising their ability to travel through the District safely and independently, and isolate them from work, education, recreation, religious services, cultural events, and shopping. To the extent blind pedestrians must spend extra time or money to navigate the District without functional APS, they are paying a "blindness tax" to participate fully in daily activities.[2]

4.     The District's failure to ensure widespread, well-functioning APS is particularly egregious because the auditory cues blind pedestrians use to cross streets in the absence of APS (i.e. listening for the surge of parallel traffic as a clue that the light has changed and that it is safe to walk) are often unreliable in the District because:

> a.     The District's streetscape is replete with complex geometry, such as traffic circles and skewed intersections, where auditory cues are less effective;
>
> b.     The District programs its pedestrian signals to give all pedestrians less time to cross the street than required by national standards, exacerbating

---

[2] *See, e.g.*, Zachary A. Morris, et al., *The Disability Squeeze: The Extra Costs of Living with Blindness or Low Vision in the U.S.*, Am. Found. for the Blind, https://www.afb.org/research-and-initiatives/research/partnered-projects/disability-squeeze-the-extra-costs-of-living-with-blindness-or-low-vision (last accessed Apr. 14, 2025) (noting how people who are blind tend to pay more for goods and services like ride-shares and food).

the dangers of crossing intersections for blind pedestrians who need more
time to cross streets safely;

c.      The District widely implements atypical signal adjustments, meaning its
traffic and pedestrian signals allow (or disallow) vehicular and pedestrian
traffic at unexpected, unusual, or unpredictable times, posing dangers
unique to blind pedestrians; and

d.      The District has high levels of street noise, making it less likely that blind
pedestrians will hear traffic, especially because some hybrid and electric
cars are already nearly impossible to detect auditorily.[3]

5.      Even at the small percentage of signalized intersections where the District has
installed APS, the District's policies and practices, or lack thereof, result in extensive problems
with incorrect installation, improper programming, and poor maintenance, rendering the installed
APS units largely ineffective and unusable by blind pedestrians.

6.      Taken together, the systemic lack of properly installed, configured, and
maintained APS units—especially given the prevalence of complex intersections, atypical signal
adjustments, and noise in the District—severely and dangerously compromises blind pedestrians'
ability to move about the District safely and independently.

---

[3] The noise level in the District is so significant that District lawmakers passed the Amplified
Sound Mitigation Regulation Amendment Act of 2024 and the Harmonious Living Amendment
Act of 2024. Both these laws became effective in 2025. *See* Harmonious Living Amendment Act
of 2024, 72 D.C. Reg. 004066 (Apr. 11, 2025), https://lims.dccouncil.gov/Legislation/B25-0750;
Amplified Sound Mitigation Act of 2024, 72 D.C. Reg. 003674 (Apr. 4, 2025),
https://lims.dccouncil.gov/Legislation/B25-0749.

7.      The need for a safe pedestrian grid is especially vital given the District's overall walkability. Recently ranked the third most walkable city in the United States,[4] a high percentage of District residents, commuters, and visitors walk as a means of transport. The lack of APS throughout the District excludes blind pedestrians from accessing services, work, events, and all aspects of life in the District.

8.      By failing to ensure that blind pedestrians have full and equal access to its pedestrian signals program, the District has violated and continues to violate Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and the District of Columbia Human Rights Act ("DCHRA").

9.      Plaintiffs seek swift and comprehensive injunctive relief on behalf of themselves and all blind pedestrians who have been discriminatorily denied the benefits of the District's pedestrian signals program and who consequently risk their safety and independence each time they navigate intersections without properly working APS devices.

**JURISDICTION**

10.      This is an action for declaratory and injunctive relief, brought under Title II of the ADA, 42 U.S.C. § 12131 *et seq.*; Section 504, 29 U.S.C. § 794; and the DCHRA, D.C. Code § 2-1402.01 *et seq.*

11.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 for claims arising under the ADA and Section 504, and supplemental jurisdiction over the DCHRA claims pursuant to 28 U.S.C. § 1367.

---

[4] Michael A. Rodriguez & Christopher B. Leinberger, *Foot Traffic Ahead: Ranking Walkable Urbanism in America's Largest Metros 2023*, Smart Growth Am. 18 (Jan. 2023), https://smartgrowthamerica.org/wp-content/uploads/2023/01/Foot-Traffic-Ahead-2023.pdf.

12.     This Court has authority to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

13.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this District. Defendant is located within this District and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## PARTIES

14.     Plaintiff District of Columbia Council of the Blind ("DCCB") is a 501(c)(3) non-profit, membership organization that advocates for full independence and equality of opportunity for all blind and visually-impaired residents of the nation's capital and surrounding metropolitan areas. The majority of DCCB's members are blind or have other vision-related disabilities and are qualified individuals with a disability within the meaning of all applicable statutes.

15.     Plaintiff Qudsiya Naqui is blind and uses a white cane for mobility assistance. She lives and works in the District and navigates the District's streets on a daily basis for professional, social, cultural, medical, and philanthropic events. Ms. Naqui is a qualified individual with a disability within the meaning of all applicable statutes.

16.     Plaintiff Kevin Andrews is blind and uses a white cane for mobility assistance. He lives and works in the District and navigates the District's streets on a daily basis for his professional, social and cultural events, shopping, and other errands. Mr. Andrews is a qualified individual with a disability within the meaning of all applicable statutes.

17.     Plaintiff Gerald Barnes is blind and uses a white cane for mobility assistance. He lives in the District and navigates the District's streets on a daily basis for social and recreational events, medical appointments, and lobbying events on Capitol Hill. Mr. Barnes is a qualified

individual with a disability within the meaning of all applicable statutes. Mr. Barnes is a member of DCCB.

18.    Plaintiff Ray Smith is blind and uses a white cane for mobility assistance. He lives in Upper Marlboro, Maryland, and regularly travels throughout the District and navigates the District's streets for medical appointments, religious activities, and social events. Mr. Smith previously lived in the District for over fifty years. Mr. Smith is a member of DCCB.

19.    Plaintiff Claire Stanley is blind and uses a guide dog for mobility assistance. She lives in Rockville, Maryland, and regularly travels throughout the District and navigates the District's streets for professional, social, cultural, medical, and philanthropic events. Ms. Stanley is a qualified individual with a disability within the meaning of all applicable statutes.

20.    Qudsiya Naqui, Kevin Andrews, Gerald Barnes, Ray Smith, and Claire Stanley collectively are defined as "Individual Plaintiffs."

21.    Defendant District of Columbia is a "public entity" as defined by Title II of the ADA and a "recipient" of federal financial assistance under Section 504 of the Rehabilitation Act. Defendant, through its Department of Transportation ("DDOT"), is a public entity responsible for installing, repairing, and maintaining all pedestrian street-crossing signals within the District. Defendant is responsible for complying with the District of Columbia Human Rights Act.

## FACTS COMMON TO ALL ALLEGATIONS

***Accessible Pedestrian Signals are Devices That Allow Blind Pedestrians to Cross Street Intersections Safely and Independently.***

22.    An Accessible Pedestrian Signal ("APS" or "APS device" or "APS unit") is a device that communicates traffic safety information (i.e., the "WALK" and "DON'T WALK" signals) in non-visual formats.

23.    APS devices have been mass marketed since the 1970s.

24.    An APS unit has a round pushbutton with a raised vibrotactile arrow and a small red light above the pushbutton, as seen in Figure 1.



*Figure 1: An APS device mounted on a pole.*
*Credit: New York City Department of Transportation.*

25.    The APS pushbutton emits a soft locator tone every second to inform blind pedestrians that the intersection has an APS installed and help them identify the appropriate crossing point. The locator tone also assists pedestrians crossing from the opposite side of the intersection by emitting a sound to walk toward.

26.    An APS device also has a vibrotactile arrow, which aligns parallel to the crosswalk and points to the opposite corner of the intersection. The vibrotactile arrow helps blind pedestrians establish proper alignment before crossing the street.

27.    When the corresponding visual pedestrian signal displays a "WALK" signal, an APS device emits a rapidly repeating percussive tone (or, under certain situations, a speech

message) and the tactile arrow vibrates. The changed sound and accompanying arrow vibration work in tandem to signal to blind pedestrians that the street is safe to cross.

28.    While some APS devices require pedestrians to press the pushbutton to activate the audible and vibrotactile walk indicator, others are programmed to communicate automatically without the need to activate the pushbutton.

29.    Each visual pedestrian signal generally has a corresponding APS; thus, a four-corner intersection with four crosswalks typically has eight pedestrian signals and eight APS devices.

30.    APS is the only technology that currently exists that comprehensively communicates traffic safety information to blind pedestrians in a manner equivalent to the information that sighted pedestrians receive.

31.    The Federal Highway Administration ("'FHWA") first established technical standards for APS in 2000 in its Manual on Uniform Traffic Control Devices ("MUTCD").[5] The standards for APS devices were updated in 2009 in the Tenth Edition of the MUTCD and again in 2023 in the Eleventh Edition of the MUTCD.[6] With respect to APS, these standards generally

---

[5] FHWA, U.S. Dep't of Transp., *Section 4E.06: Accessible Pedestrian Signals*, MUTCD: Part 4 Highway Traffic Signals 4E-5–4E-8 (1st ed. Dec. 2000), https://mutcd.fhwa.dot.gov/pdfs/millennium/12.18.00/4.pdf.

[6] FHWA, U.S. Dep't of Transp., *Section 4E.09: Accessible Pedestrian Signals and Detectors – General*, MUTCD: Part 4 Highway Traffic Signals 504, 504-05 (9th ed. Dec. 2009), https://mutcd.fhwa.dot.gov/pdfs/2009/part4.pdf; FHWA, U.S. Dep't of Transp., *Section 4K.01(01): General*, MUTCD 731 (11th ed. Dec. 2023), https://mutcd.fhwa.dot.gov/pdfs/11th_Edition/mutcd11theditionhl.pdf.

set out how to configure, install, and maintain APS devices so that intersections are safe and accessible for blind pedestrians.[7]

32.    Courts in New York and Chicago have held that failing to install sufficient APS across a city's pedestrian grid such that blind pedestrians can safely and independently cross signalized intersections is a violation of the ADA and Section 504. *Am. Council of the Blind of Metro. Chi. v. City of Chicago*, 667 F. Supp. 3d 767, 778–80 (N.D. Ill. 2023); *Am. Council of the Blind of N.Y., Inc. v. City of New York*, 495 F. Supp. 3d 211, 233 (S.D.N.Y. 2020). When ordering a remedy, these courts have recognized that APS must be installed and maintained in accordance with the MUTCD. Remedial Order, *Am. Council of the Blind of N.Y., Inc. v. City of New York*, No. 18-cv-05792 (S.D.N.Y. Mar. 18, 2022), ECF No. 208; Proposed Remedial Order, *Am. Council of the Blind of Metro. Chi. v. City of Chicago*, No. 19-cv-06322 (N.D. Ill. Apr. 9, 2025), ECF No. 351-1.[8]

### *While The District Has Expended Substantial Resources Generally to Improve Pedestrian Safety, It Has Not Made Signalized Intersections Accessible for Blind Pedestrians.*

33.    The District has implemented policies and practices and invested resources to improve pedestrian safety.

---

[7] In 2023, the U.S. Access Board promulgated Accessibility Guidelines for Pedestrian Facilities in the Public Right-of-Way ("PROWAG"), which also include technical guidelines for APS. 36 C.F.R. Part 1190.

[8] As of the date of filing, the Parties' Stipulated Remedial Order in *American Council of the Blind of Metropolitan Chicago v. City of Chicago* is currently pending before the court.

34.     In coordination with DDOT, in 2009, Defendant developed a Pedestrian Master Plan to increase pedestrian activity and reduce pedestrian deaths and injuries.[9] Since then, the District implemented several capital infrastructure initiatives to accomplish these goals.

35.     In 2015, the District launched a Vision Zero initiative and set the goal of reducing the number of pedestrian fatalities and serious injuries to zero by 2024.[10]

36.     In 2019, the District introduced several initiatives including "bus only" traffic lanes,[11] and "bus only" traffic signals, which allow buses to proceed through intersections before the standard traffic signals turn green.[12] The District also painted high-visibility crosswalks[13] and, significantly, adjusted visual signal timing for at least 270 intersections to improve safety for sighted pedestrians.[14]

---

[9] DDOT, *District of Columbia: Pedestrian Master Plan* (Apr. 2009) https://ddot.dc.gov/sites/default/files/dc/sites/ddot/publication/attachments/pedestrianmasterplan _2009.pdf.

[10] *A Plan of Action*, Vision Zero DC (Dec. 2015) https://dcgis.maps.arcgis.com/sharing/rest/content/items/c1e6da7e02b8460f913e3e721c3b14ac/d ata.

[11] Caitlin Rogger, *Bus-only lanes on H and I streets NW could make for a faster downtown commute*, Greater Greater Washington (Mar. 18, 2019), https://ggwash.org/view/71350/new-bus-only-lanes-on-h-and-i-streets-could-make-for-a-faster-commute.

[12] *At six DC intersections, bus customers now get a jump on traffic,* Wash. Metro. Area Transit Auth. (Mar. 19, 2019), https://www.wmata.com/about/news/At-six-DC-intersections-bus-customers-now-get-a-jump-on-traffic.cfm.

[13] Jack Pointer & Kristi King, *Look for new crosswalks around DC — they should be easy to notice*, WTOP News (June 20, 2019), https://wtop.com/dc/2019/06/look-for-new-crosswalks-around-dc-they-should-be-easy-to-notice/.

[14] Andrew Glambrone, *270 traffic signals in Northwest now give pedestrians and cyclists more time to cross*, Curbed (Nov. 12, 2019), https://dc.curbed.com/2019/11/12/20961246/dc-traffic-signals-crosswalks-pedestrians-walking-driving.

37.     In 2021, Defendant charged DDOT with accelerating roadway and intersection improvements intended to enhance pedestrian safety, including installing speed humps, stop signs, right turn hardening measures, and high-visibility crosswalks.[15]

38.     In 2024, the D.C. Council passed a law banning drivers from turning right on red in an effort to increase pedestrian safety, though the District will only enforce the law at half of its intersections.[16]

39.     The District plans to unveil a new Vision Zero Action Plan in 2025 and has already announced a new initiative in 2025 to curb traffic deaths.[17]

40.     Despite these wide-ranging initiatives to improve pedestrian safety, Defendant's policies and practices leave most of its signalized pedestrian signals inaccessible to blind pedestrians.

41.     The vast majority of signalized intersections in the District do not have APS. On its VisionZero website, the District admits that nearly 75% of its signalized intersections do not have APS. Other District sources suggest the number is even higher. Regardless of whether any

---

[15] *Mayor Bowser Accelerates Pedestrian Safety Projects and Announces Streamlined Process for Roadway Safety Improvements*, Gov't of D.C. (Oct. 12, 2021), https://mayor.dc.gov/release/mayor-bowser-accelerates-pedestrian-safety-projects-and-announces-streamlined-process.

[16] Rachel Weiner & Joe Heim, *The D.C. Council banned turning right on red citywide. It won't be enforced.*, Wash. Post (Nov. 25, 2024), https://www.washingtonpost.com/dc-md-va/2024/11/25/dc-right-on-red-ban-dispute/.

[17] DDOT, DDOT 2025 Performance Oversight Pre-Hearing Responses 52 (Feb. 11, 2025), https://lims.dccouncil.gov/Hearings/hearings/716 (discussing a "forthcoming Vision Zero/ Strategic Highway Safety Plan led by the DC Vision Zero Office and DC Highway Safety Office as a joint effort"); Dan Ronan, *DC officials announce new plan to lower traffic deaths and crashes*, WTOP News (Feb. 26, 2025), https://wtop.com/dc/2025/02/dc-officials-announce-new-plan-to-lower-traffic-deaths-and-crashes/.

of these public sources is correct, based on Plaintiffs' experiences, the District's APS installations are woefully inadequate to address the needs of blind pedestrians.

42.    The District is not addressing the lack of APS with any urgency or consistency. Per DDOT policy, the District installs APS when it constructs new traffic signals as part of the Individual Intersection Project which, by its own estimates, results in APS installations at only 5–15 intersections per year.[18] DDOT also installs APS when it does major roadway and streetscape projects under the Corridor Projects program, which, by the District's own estimates, results in APS installation at 10–15 signals per project.[19]

43.    DDOT also claims to install APS at standalone locations in response to community requests. However, there is no guarantee that DDOT will install an APS in response to a community request, as DDOT policy states that if a full signal rebuild is necessary, it will balance the community request with other project priorities and budgetary constraints.[20]

44.    The District's policies and practices lead to—and will continue to result in—an insufficient number of APS installations to meet the needs of its blind pedestrians.

45.    Moreover, Defendant's policies and practices, or lack thereof, are insufficient to ensure that APS are correctly installed, inspected, and maintained, resulting in significant barriers to usability for blind pedestrians in the District, as alleged below.

---

[18] DDOT, *2025 ADA Transition Plan Update*, 12 (2025), https://ddot.dc.gov/sites/default/files/dc/sites/ddot/2025%20Americans%20with%20Disabilities%20Act%20%28ADA%29%20Transition%20Plan%202.28.25.pdf.

[19] *Id*.

[20] *Id.*

***The District's Systemic Failure to Equip Pedestrian Signals with Reliable APS is Particularly Egregious Given Features of the District that Make Alternative Auditory Cues for Safe Crossing Ineffective for Blind Pedestrians.***

46.     At traditional, four-way intersections with right angles without APS, blind pedestrians determine when it is safe to begin crossing the street by listening for the auditory cue of surging or moving parallel traffic. Blind pedestrians also rely on the sound of parallel traffic to align themselves in the crosswalk, maintain a consistent distance from parallel traffic, and arrive safely on the opposite curb. While imperfect in any environment, these auditory cues are especially unreliable when intersections are complex, have atypical signal adjustments, or are in noisy environments.

## Complex Streetscape

47.     The traditional cues blind pedestrians use to cross the street without APS are not reliable when intersections are skewed or have complex geometry. When traffic is not parallel to the crosswalk, blind pedestrians cannot listen for the sound of the surge of parallel traffic to know when to cross the street. Nor can they use the sound of parallel traffic to determine the direction of the crosswalk and which direction to walk to cross the street.

48.     The District streetscape is rife with skewed and complex intersections. If they do not have functioning APS installed that clearly informs a blind pedestrian when it is safe to cross, these intersections make navigation especially dangerous for blind pedestrians.

49.     The District is well-known for its "traffic circles," meaning locations where three or more roads meet and vehicular traffic travels around a circular area in the middle. As illustrated in Figure 2 below, Dupont Circle is one example of a traffic circle in the District.



*Figure 2: Aerial image of Dupont Circle.*
*Source: Google.*

50.     Several intersections in the District are "skewed," meaning the intersecting streets do not form right angles. For example, as illustrated in Figure 3 below, Potomac Avenue, SE, Pennsylvania Avenue, SE, and 14th Street, SE intersect to form a skewed intersection.



*Figure 3: Aerial image of skewed intersection.*
*Credit: Google.*

51.     Other intersections in the District are "T-intersections," meaning that two roads intersect and form a T-shape, creating three distinct segments of roads. For example, as illustrated in Figure 4 below, 6th Street, SW and C Street, SW intersect to form a T-intersection.



*Figure 4: Aerial image of T-intersections.*
*Credit: Google.*

52.     The District has several intersections with more than four legs, meaning intersections where more than two roads meet. For example, as illustrated in Figure 5 below, 16th Street, NW, U Street, NW, and New Hampshire Avenue, NW intersect to create six legs.



*Figure 5: Aeriel image of intersection with six legs.*
*Credit: Google.*

53.    The District also has "diagonal crosswalks," meaning intersections that allow pedestrians to cross an intersection in any direction. Diagonal crosswalks are accompanied by Exclusive Pedestrian Phasing, where all vehicle traffic is stopped and pedestrians cross in all directions at the same time, as described further below. The District has at least two diagonal crosswalks, located at 7th and H Streets NW and 14th and Irving Streets NW. The diagonal crosswalk located at 7th and H Streets NW is illustrated in Figure 6 below.



*Figure 6: Google Street View of 7th and H Streets NW.*
*Credit: Google.*

16

54.    The District has also increasingly installed "median refuge islands," meaning designated spaces between travel lanes that provide pedestrians a place to wait until it is safe to cross in each direction, as illustrated in Figure 7 below. Median refuge islands are generally found at skewed or complex intersections.



*Figure 7: Photo of a median refuge island.*
*Credit: D.C. Department of Transportation.*

55.    Blind pedestrians are severely disadvantaged when attempting to cross skewed or otherwise complex intersections without APS because the unusual aspects of these intersections make it particularly difficult for blind pedestrians to determine when it is safe to cross the street, their correct direction of travel, or whether they have reached the curb or the median. Blind pedestrians travel significantly out of their way to avoid these intersections without APS.

56.    Despite these known dangers, the District has not installed APS units at the vast majority of skewed or complex intersections.

**Pedestrian Signal Timing**

*Insufficient Time to Cross the Street*

57.     As a result of District policies and practices, pedestrians in the District often do not have enough time to cross the street, as pedestrian signals are programmed to provide a dangerously short walk interval. Blind pedestrians are disproportionately impacted because they often need more time to cross the street than sighted pedestrians.

58.     The MUTCD requires public entities to program pedestrian signals to ensure pedestrians have enough time to travel across the street if they leave the curb at the end of the walk signal (i.e., right before the "WALK" signal begins to count down or flash) traveling at the speed of 3.5 feet per second ("pedestrian clearance time").[21]

59.     The MUTCD also requires a "buffer interval" of at least 2 seconds when all vehicle and pedestrian traffic have a red signal to stop, allowing the entire intersection to clear before traffic begins to move again.[22]

60.     Yet, many pedestrian signals in the District provide insufficient pedestrian clearance time and many have no buffer interval.

61.     For intersections without APS, the District's failure to provide sufficient pedestrian clearance time and a buffer interval exacerbates the already-present safety risks for blind pedestrians, who require time to position themselves before crossing the street. Because of insufficient pedestrian clearance time, blind pedestrians are more likely than sighted pedestrians to be in mid-crossing when perpendicular vehicles get the green light.

---

[21] FHWA, *Section 4I.06(07)*, MUTCD (11th ed. Dec. 2023), *supra* note 6, at 724.

[22] FHWA, *Section 4I.06(04)*, MUTCD (11th ed. Dec. 2023), *supra* note 6, at 723.

*Signal Adjustments That Make Intersections Without APS Less Safe For Blind Pedestrians*

62.    Over the last decade, the District has implemented several traffic and pedestrian signal adjustments to improve pedestrian safety, such as Leading Pedestrian Intervals, Leading and Lagging Protected Turns, and Exclusive Pedestrian Phasing. While these signal adjustments improve safety for sighted pedestrians, when implemented without APS, they make intersections less safe for blind pedestrians.

<u>Leading Pedestrian Interval</u>

63.    A Leading Pedestrian Interval ("LPI") is a signal timing variant where the pedestrian signal instructs pedestrians to begin crossing the intersection three to ten seconds *before* the traffic signal directs vehicular traffic heading in the same direction to begin moving. With this head start, pedestrians have already established their presence in the crosswalk when vehicles have a green light and thus, are more visible to drivers.

64.    The District relies heavily on LPIs in its efforts to improve pedestrian safety, including it as part of its Vision Zero initiative.[23] Approximately 75% of its signalized intersections now have implemented LPIs.[24]

65.    While LPIs make street crossing safer for sighted pedestrians, they make street crossing more dangerous for blind pedestrians when the LPIs are not accompanied by APS.

66.    When APS is correctly installed at signalized intersections with LPIs, blind pedestrians have access to the same information at the same time as sighted pedestrians.

67.    Without APS, or when APS units are not functioning correctly, blind pedestrians crossing an LPI intersection have no way of knowing that the pedestrian signal is giving them a

---

[23] *Engineering for Safety: Leading Pedestrian Intervals (LPI)*, Vision Zero DC, https://visionzero.dc.gov/pages/engineering (last accessed Apr. 15, 2025).

[24] *Id.*

head start, and so do not start crossing with the rest of the pedestrians. By losing the head start, blind pedestrians have less time than sighted pedestrians to complete the crossing before the signal changes. While losing any time to cross heightens the dangers for blind pedestrians who often require more time to cross, the problem is exacerbated because the District already provides insufficient pedestrian clearance time.

68.    Additionally, when crossing an LPI intersection without APS, or when APS devices are not functioning correctly, blind pedestrians use auditory cues and begin to cross when they hear the surge of parallel traffic, therefore entering the crosswalk after other pedestrians and at the very same time vehicles are surging. As a result, drivers are not expecting to see new pedestrians entering the crosswalk so are less prepared to yield, adding to the peril for blind pedestrians.

69.    Despite these known dangers, the District does not install APS when it adjusts a signal to implement LPI.

Protected Turns

70.    A Leading Protected Turn is a traffic signal variation when signals are adjusted to give vehicular traffic the exclusive right-of-way to turn at the *start* of a green signal, while allowing traffic to move straight through the intersection. A Lagging Protected Turn is when signals are adjusted to give vehicular traffic the exclusive right-of-way to turn at the *end* of the green signal, while allowing traffic to move straight through the intersection.

71.    Without APS, it is difficult for blind pedestrians to determine if they have the right-of-way to cross at intersections with Protected Turns. In such intersections, blind pedestrians may interpret the sound of parallel traffic to be the auditory cue to begin crossing the crosswalk, even though vehicular traffic has the exclusive right of way to turn. Further, it is hard for blind pedestrians to rely on auditory cues to guide them to walk in a straight line, as turning

20

vehicle traffic sounds can cause confusion about the direction of the crosswalk. Blind pedestrians are therefore at risk of walking into vehicular traffic or walking outside the crosswalk at intersections with Protected Turns and no APS.

72.     Despite these known dangers, very few intersections in the District with Protected Turns are equipped with APS.

Exclusive Pedestrian Phasing

73.     Exclusive Pedestrian Phasing ("EPP"), also known as a "Barnes Dance" intersection or a "pedestrian scramble" is an intersection where all vehicular traffic stops at the same time and pedestrians can cross in all directions. Conversely, when vehicular traffic is moving, all pedestrians have a "DON'T WALK" signal.



*Figure 8: Diagram of pedestrian movement flows at an EPP intersection when pedestrians have the "WALK" signal. Credit: New York City Department of Transportation.*

74.     EPP crosswalks can enhance pedestrian safety for sighted pedestrians by minimizing conflicts between pedestrian and vehicular traffic.

75.     Without APS, blind pedestrians will not know when they can safely cross an EPP intersection because there is no auditory cue from the surge of traffic.

76.    Additionally, without APS, intersections with EPPs pose a safety risk for blind pedestrians who interpret the sound of traffic movement as a cue to begin to cross the street when the visual pedestrian signal communicates that pedestrians have a "DON'T WALK" signal. Further, drivers are not expecting pedestrians when vehicular traffic has an exclusive right-of-way, adding to the peril for blind pedestrians.

77.    Despite these known dangers, neither of the District's two EPP intersections have APS.

### APS Devices That Are Not Properly Installed, Programmed, and Maintained Do Not Help Blind Pedestrians.

78.    Although the District has installed APS units at a small percentage of its signalized intersections, due to widespread problems with installation, programming, and maintenance, these devices are not effectively making the streets accessible for blind pedestrians.

79.    Throughout the District, APS devices are ineffective because they:

a.    have low or no audio output;

b.    have misaligned tactile arrows;

c.    have vibrotactile arrows that do not vibrate or cannot be felt;

d.    overly rely on speech messages instead of using percussive tones to communicate the "WALK" signal, which makes the APS less effective; and/or

e.    do not always run concurrently with, and for the same duration as, visual "WALK" signals.

80.    An effective APS has a locator tone that is loud enough for blind pedestrians to hear above ambient street noise. This allows blind pedestrians to know that the intersection has an APS installed, helps them identify the appropriate crossing point, and assists pedestrians

crossing from the opposite side of the intersection by emitting a sound to walk toward. The MUTCD requires locator tones to be "audible 6 to 12 feet from the push button, or to the building line, whichever is less."[25] Throughout the District, locator tones are barely audible. As a result, blind pedestrians do not know that an intersection has an APS installed, cannot identify the appropriate crossing point, and have no sound to walk toward when crossing the intersection.

81.    An effective APS similarly has an audible walk indicator that is loud enough for a blind pedestrian to hear above ambient street noise. Audible walk indicators notify blind pedestrians when the visual "WALK" signal is on. And, for APS devices that do not require activation, the audible walk indicator also lets the blind pedestrian know if the "WALK" signal remains on while they are crossing and can guide the blind pedestrian in the right direction towards the opposite curb. The MUTCD requires the audible walk indicator to be audible from the beginning of the crosswalk.[26] Throughout the District, a substantial number of APS devices have audible walk indicators that are too quiet because the device is programmed incorrectly or not functioning properly. As a result, blind pedestrians do not know when they may safely cross the street or the direction they should ambulate while crossing.

82.    An effective APS has a vibrotactile tactile arrow that allow blind pedestrians to orient themselves to the adjacent crosswalk, enabling them to cross the street in a straight line. The MUTCD requires the vibrotactile arrow to be "aligned parallel to the direction of travel on the associated crosswalk."[27] Throughout the District, APS devices have misaligned tactile

---

[25] FHWA, *Section 4K.04(08)*, MUTCD (11th ed. Dec. 2023), *supra* note 6, at 734.

[26] FHWA, *Section 4K.03(05)*, MUTCD (11th ed. Dec. 2023), *supra* note 6, at 732.

[27] FHWA, *Section 4K.04(01)*, MUTCD (11th ed. Dec. 2023), *supra* note 6, at 734.

arrows, as illustrated in Figure 9 below. As a result, blind pedestrians are directed away from the crosswalk and into traffic.



*Figure 9: Image of a misaligned vibrotactile arrow on an APS.*
*Credit: Jordan Pascale / DCist / WAMU.*

83.     An effective APS unit has an arrow that vibrates to indicate that the "WALK" signal is on and that it is safe to cross. This provides blind pedestrians, including those who cannot hear the audible walk indicator, another signal that is safe to cross the street. The MUTCD requires the vibrotactile arrow to vibrate during the walk interval.[28] Throughout the District, a substantial number of APS devices have arrows where the vibrotactile output cannot be felt, either because the device is broken or because it emits no perceptible tactile signals. As a result, blind pedestrians do not have access to this signal to know when it is safe to cross the street.

---

[28] FHWA, *Section 4K.03(03)*, MUTCD (11th ed. Dec. 2023), *supra* note 6, at 732.

84.     An effective APS device uses rapidly repeating percussive tones instead of speech messages (i.e., natural language) to inform blind pedestrians whether it is safe to cross the street. Research indicates that speech messages are less effective than percussive tones for several reasons: speech messages are more difficult to hear and comprehend, require blind pedestrians to be pre-oriented to an area and know the names of the parallel and perpendicular streets to know where to cross, take longer to process and react to, and are inaccessible to non-English speakers. The MUTCD specifies that APS devices should use percussive tones in most circumstances.[29] Throughout the District, APS are programmed to use speech messages and generally lack percussive tones. As a result, these APS devices' communications are less effective for blind pedestrians.[30]

85.     An effective APS device is programmed so its audio and vibrotactile signals are activated at the same time as, and for the same duration of, the visual pedestrian "WALK" signal. This provides blind pedestrians with the same information as their sighted counterparts. When properly programmed, the accessible walk indicator does not terminate prematurely but remains on so long as the pedestrian has sufficient crossing time. Similarly, if the visual "WALK" signal is already on when the pushbutton is activated, an APS unit walk indicator is

---

[29] Though disfavored, national standards require APS to use speech messages in limited circumstances, such as when physical constraints make it impracticable for APS to be placed at least 10 feet away from one another. FHWA, *Section 4K.03(07)*, MUTCD (11th ed. Dec. 2023), *supra* note 6, at 732 ("In all other cases [where there are not two APS units within 10 feet of each other], the audible walk indication shall be a percussive tone."). In such cases, national standards prescribe that the speech messages follow a standardized format, for example, "[Street name], Walk sign is on to cross [Street name]." FHWA, *Section 4K.03(17)–(21)*, MUTCD (11th ed. Dec. 2023), *supra* note 6, at 733. Throughout the District, the APS devices programmed with speech messages do not comport with these national standards.

[30] APS devices can be programmed to provide additional information, including intersection identification, using an extended push button. FHWA, *Section 4K.05(01), (12)*, MUTCD (11th ed. 2023), *supra* note 6, at 734–35.

still activated so long as the pedestrian has sufficient crossing time. This allows blind pedestrians to cross the street at the earliest time possible. It also ensures that they do not miss opportunities for safe crossing and are not forced to wait for additional cycles to cross the street. The MUTCD generally requires that the accessible walk indication has the same duration as the visual pedestrian signal.[31] However, throughout the District, the accessible walk indicator terminates prematurely. Similarly, throughout the District, when blind pedestrians activate an APS while the visual "WALK" signal is on, the APS often indicates that it is not safe to cross. As a result, these APS devices' communications are less effective for blind pedestrians, and blind pedestrians are forced to wait unnecessarily for additional cycles to cross.

## PLAINTIFFS' INDIVIDUAL EXPERIENCES

86.    Plaintiff DCCB is a 501(c)(3) non-profit, membership organization that advocates for full independence and equality of opportunity for all blind and visually impaired residents of the nation's capital and surrounding metropolitan areas. DCCB is an affiliate of the national American Council of the Blind.

87.    DCCB's purpose is to "promote the social, economic, cultural and general welfare of people who are blind and visually impaired residents of the District of Columbia and metropolitan area" and "stimulate the development of practical and self-help activities by working for improvement in . . . community services."[32] Advocating for the ability of blind pedestrians to safely and independently traverse the District is germane to DCCB's mission.

88.    DCCB membership is open to any individual at least 18 years of age who is committed to DCCB's goals and objectives and who pays the annual membership dues. Blind

---

[31] FHWA, *Section 4K.03(05)*, MUTCD (11th ed. 2023), *supra* note 6, at 732.

[32] *Bylaws: Article II*, DCCB, https://dccounciloftheblind.org/bylaws (last accessed Apr. 15, 2025).

and visually impaired persons must make up a majority of DCCB's membership. Members inform the priorities of the organization and guide its activities based on issues most prevalent in the District. For example, DCCB's issue areas include transportation and mobility, education, housing, employment, and independent living skills and support.

89.    DCCB has approximately 135 members. Plaintiffs Gerald Barnes and Ray Smith are members of DCCB.

90.    DCCB elects officers, including a President, Vice President, Secretary, Treasurer, Information Office, and three additional members of the Executive Board. The officers, together with the immediate Past President of the DCCB, make up the Executive Board and are selected by the members through secret ballot. The Executive Board, with input from its members, is responsible for directing the overall work of DCCB.

91.    DCCB members navigate the District's streets on a daily basis. Due to the systemic lack of reliable APS, DCCB members are unable to navigate the District safely and independently. DCCB members, like other blind pedestrians, are forced to rely on others, risk their safety, pay for transportation, or avoid the streets altogether.

92.    Defendant's discriminatory actions and failures to act have injured and are injuring DCCB members, providing DCCB members' standing to bring a suit in their own right.

### Plaintiff Qudsiya Naqui

93.    Plaintiff Qudsiya Naqui is blind as a result of a congenital eye condition that causes progressive loss of central and peripheral vision. She has had night blindness since birth. Her vision loss escalated beginning in 2008 and she began using a white cane for mobility assistance.

94.    Ms. Naqui lives in the Dupont neighborhood in Northwest Washington, D.C., and works in the NoMa neighborhood in Northeast D.C. For social and recreational purposes, she

travels frequently throughout the metropolitan area, including Tenleytown (in Northwest), Eastern Market (in Southeast), and elsewhere.

95.    As a District resident, Ms. Naqui crosses signalized intersections virtually every day of her life. She has regularly encountered intersections in the District that lack properly installed APS where signals were not audible over the ambient noise or ones that provide incorrect information that put her in peril. For example, Ms. Naqui has encountered APS at complex intersections with multiple intersecting streets that indicate it is safe to cross one street even though cars have the signal to cross a third, intersecting street.

96.    Ms. Naqui experiences particular difficulty at traffic circles or at intersections with diagonal intersecting streets, especially when they are not equipped with APS devices or where an APS device does not emit an audible tone loud enough for her to locate the device or know when the "WALK" sign is on.

97.    In the absence of properly functioning APS devices, Ms. Naqui relies on the sound of parallel traffic as a cue for when to begin to cross the street. But that technique—which she learned in the mobility training she received as her vision deteriorated—is dangerous at complex intersections or intersections with atypical signal adjustments, such as when right- or left-turn arrows permit cars to proceed while holding back pedestrians. Unless an APS device clearly instructs her not to begin crossing, such intersections are particularly dangerous for her.

98.    Fewer than one-quarter of intersections that Ms. Naqui regularly encounters have any form of APS at all.  On a daily basis, Ms. Naqui avoids intersections and routes with which she is unfamiliar and often must take much longer routes to ensure that she does not have to use routes lacking properly functioning APS devices. She cannot rely on the District to provide

properly functioning APS devices to permit her to safely navigate along a connected path of travel from her point of origin to her destination for any appreciable distance.

99.     For instance, while the most direct route from Dupont Circle to Logan Circle is along Massachusetts Avenue, Ms. Naqui avoids that route because it has no functioning APS devices and many complex intersections. Instead, she frequently opts to stay on the rectangular grid of "letter" and "number" streets, even though it takes a considerably longer time to walk that farther distance. Similarly, she avoids traveling along Pennsylvania Avenue and Rhode Island Avenue because she cannot count on finding functioning APS devices along those routes.

100.    Most of the intersections Ms. Naqui regularly encounters are in high-traffic areas traversed by thousands of pedestrians and vehicles every single day. As such, they are noisy and complex in their design, featuring multiple traffic lanes and directions.

101.    In less heavily trafficked neighborhoods—where there is not a constant flow of traffic throughout the day—Ms. Naqui often cannot rely on the presence of parallel car traffic as a cue for when it is safe to cross at a signalized intersection. Properly functioning APS devices are, therefore, also important at such intersections.

102.    Ms. Naqui's safety is also compromised at intersections with a "leading pedestrian interval" that is not properly announced by an APS device because it deprives her of the audible cue of parallel traffic entering the intersection in the same direction she is traveling. She worries that she is "losing time" to safely cross the street. That problem is exacerbated by the fact that many of the intersections she encounters already have pedestrian crossing intervals too short to provide for a safe crossing.

103.    As a result of these deficiencies, if she cannot safely walk from a Metro stop to her destination, Ms. Naqui relies on ride-share services, thereby incurring additional costs not borne by sighted pedestrians in the District.

104.    Taken together, these experiences reflect Ms. Naqui's longstanding struggle with access barriers resulting from the systemic lack of properly functioning APS devices in the District. Because she will continue to require APS to navigate the District safely and independently, the lack of effective APS will affect her in her daily life for the foreseeable future.

### Plaintiff Kevin Andrews

105.    Plaintiff Kevin Andrews was born with cataracts and has been blind since birth. He uses a white cane for mobility assistance.

106.    Mr. Andrews lives in the Cathedral Heights neighborhood in Northwest Washington, D.C. and works in D.C.'s Glover Park neighborhood. For social and recreational purposes, he regularly travels to different areas of the District, such as Eastern Market, Farragut Square, Foggy Bottom, and Tenleytown.

107.    Mr. Andrews crosses signalized intersections in Washington, D.C. virtually every day. He often encounters signalized intersections in the District that lack APS or have APS that does not function properly. He estimates that on a given day, nearly half of the APS on his near-daily commute to Glover Park have functionality issues such as an inaudible locator tone. The majority of the intersections on his commute do not feature APS at all.

108.    Because of Mr. Andrews's limited vision, he cannot see where APS units are located and relies entirely on the locator tone to guide him to the device. When the locator tone is not working or is not loud enough to be heard over ambient noise, he has extreme difficulty

30

engaging with the APS device at all. Likewise, when the APS walk indicator is not working or is not loud enough to be heard over ambient noise, he is unable to ascertain when it is safe to cross the street. Mr. Andrews especially struggles with the devices' locator tone volume when it is raining, because rain increases ambient street noise and makes the tone more difficult to hear.

109.    When there is no APS, or the APS unit is not audible, Mr. Andrews must rely on strangers to assist him by telling him when it is safe to walk. However, this strategy is not effective for walks at night or in the early morning, when there are fewer pedestrians around to assist. Sometimes Mr. Andrews relies on pedestrians approaching him from the other side of the street to tell him that it is safe to walk. However, in such cases, considerable time has often passed by the time such pedestrians can assist him, leaving Mr. Andrews with less time to cross the street than sighted pedestrians. Sometimes when Mr. Andrews is confronted with an unfamiliar intersection without APS, he will avoid the peril of crossing that intersection by walking a block or more out of the way, only to double back and continue on his route. This strategy takes additional time and effort that sighted pedestrians do not have to exert.

110.    Mr. Andrews frequently struggles with the lack of APS in high-traffic and complex intersections in D.C. He avoids many intersections that lack APS and are therefore too dangerous to cross, or can be crossed only with great fear and at great personal risk. These intersections include:

>    (a)    17th Street NW and I Street NW, at the Southwest corner of Farragut
>           Square. This is a busy intersection of two major streets, each of which are
>           wide and contain separate bus lanes. Mr. Andrews must pass through this
>           area frequently, including while traveling between Cathedral Heights and
>           Capitol Hill to visit Eastern Market and other destinations in Southeast

Washington, D.C.. He typically gets off of a bus at the northwest corner and must cross two crosswalks to get to the southeast corner where there is a Metro entrance. Neither of these crosswalks have APS and the experience is hazardous.

(b)     Dupont Circle. This is a busy and complicated confluence of ten roadways, with pedestrian crossings around the perimeter and across the center of the circle. Mr. Andrews visits the area near Dupont Circle one to two times per week to visit its restaurants, shopping and other amenities.

(c)     Tenley Circle. This is a busy and complex confluence of six roadways, with pedestrian crossings around the perimeter and across the center of the circle. Mr. Andrews must navigate this intersection several times per month, as it is on his route to the Tenleytown-AU metro station. He also goes to the area for shopping and other errands such as haircut appointments.

111.     Mr. Andrews frequently uses other signalized intersections that are similarly noisy and complex in design when navigating to various daily destinations.

112.     Mr. Andrews has encountered recurring problems with the deficient APS, or lack of APS at all, at several major signalized intersections in his neighborhood.

(a)     Massachusetts Ave and Wisconsin Avenue, a skewed intersection near the National Cathedral, lacks APS at its crosswalks, despite the heavy vehicular and pedestrian traffic.

(b)     The complex intersection at Calvert Street, Wisconsin Avenue, and 37th Street NW sits at the edge of a major commercial corridor with transit

access, retail, and a gas station. It did not have APS for a long time. After Mr. Andrews made numerous complaints to his local councilmember and various District employees, APS was installed. However, the locator tone is consistently too quiet to assist blind pedestrians. When the locator tone was inaudible on a recent walk, Mr. Andrews relied on an individual who yelled to him from their car window that it was safe to walk.

(c)     Idaho Avenue NW and Wisconsin Avenue NW is a skewed intersection on a busy thoroughfare. Mr. Andrews recently entered the intersection near the end of the WALK signal because the tone on the APS did not indicate that it was safe to walk at a volume that he could hear. Mr. Andrews was helped by another pedestrian who told him to wait until the next cycle.

113.     Mr. Andrews's safety is further compromised at intersections with an LPI that lack APS because he lacks the audible cue of parallel traffic when pedestrians have the visual "WALK" signal. This reduces the time he has to safely cross the street, and causes him to enter the crosswalk at the same time as turning vehicles.

114.     Taken together, these experiences reflect Mr. Andrews's longstanding struggle with access barriers resulting from the systemic lack of properly functioning APS devices in the District. Because he will continue to require APS to navigate the District safely and independently, the lack of effective APS will affect him in his daily life for the foreseeable future.

*** Plaintiff Gerald Barnes ***

115.     Plaintiff Gerald Barnes is blind as a result of a hereditary glaucoma that led to his vision loss in 2000. He only has limited cloudy vision in his right eye.

116.    Mr. Barnes has lived in Washington, D.C. for the past 42 years and currently lives in the Brookland neighborhood in the Northeast quadrant of the city. Mr. Barnes regularly travels throughout Washington, D.C. for social and recreational events, medical appointments, and lobbying events on Capitol Hill.

117.    As a District resident, Mr. Barnes crosses signalized intersections almost every day of his life. He regularly encounters intersections in the District that lack properly installed APS, or do not function properly and do not inform him when it is safe to cross. For instance, he frequently encounters APS signals that are not audible or have a very low volume that cannot be heard over ambient noise, and ones that do not allow sufficient time to cross the street, putting his safety at risk.

118.    He encounters significant challenges navigating traffic circles, such as Dupont Circle, and high-traffic intersections, including those along the H Street and U Street Corridors, particularly in the absence of APS or when the APS devices fail to emit an audible tone at a volume sufficient to enable him to locate the signal or determine when it is safe to cross.

119.    Although Mr. Barnes travels throughout the District multiple times throughout the week, on average, he only encounters APS at signalized intersections about once a month. Because he has no certainty that he can walk for any appreciable distance and encounter properly functioning APS devices, he avoids intersections and routes with which he is unfamiliar.

120.    To cross signalized intersections without APS, Mr. Barnes relies on a number of methods, none of which adequately protect his safety. These methods include listening for traffic moving in the same direction as him, crossing in packs of people, and walking blocks out of his way to avoid dangerous intersections on the way to his destination. When traveling to unfamiliar parts of the District that lack APS, Mr. Barnes will rely on MetroAccess Paratransit or cabs

34

rather than risk his safety to cross the street. These methods are unsafe and a drain on Mr.
Barnes's energy, financial resources, and general ability to accomplish everyday tasks safely and
without undue stress.

121.    In the absence of properly functioning APS devices in high-traffic complex
intersections, Mr. Barnes finds it especially difficult to rely on the sound of parallel traffic to
know when it is safe to cross. The issue becomes even more dangerous when there are complex
intersections or atypical signal adjustments, such as right- or left-turn arrows that permit cars to
proceed before giving a "WALK" signal to pedestrians. Unless an APS device clearly instructs
him not to begin crossing, such intersections are particularly dangerous for him.

122.    Mr. Barnes has actively participated in group discussions advocating for
improved accessibility of the pedestrian grid, including the insufficient installation and
maintenance of APS, with the District's Department of Transportation. Despite these efforts, no
concrete action has been taken regarding the lack of properly functioning APS.

123.    Taken together, these experiences reflect Mr. Barnes's longstanding struggle with
access barriers resulting from the systemic lack of properly functioning APS devices in the
District. Because he will continue to require APS to navigate the District safely and
independently, The lack of effective APS will affect him in his daily life for the foreseeable
future.

### *Plaintiff Ray Smith*

124.    Plaintiff Ray Smith lost his sight due to diabetic retinopathy and has been blind
since 2007. Plaintiff Smith is a member of DCCB.

125.    Mr. Smith was born and raised in Washington, D.C. and lived in the District for
over fifty years. In 2016, he moved to Upper Marlboro, Maryland where he currently resides. He
regularly travels to D.C. for medical appointments, religious activities, and social events.

126.    While carrying out these activities, Mr. Smith frequently comes across intersections in the District that either lack APS altogether or have APS that are improperly installed, inaudible, malfunctioning, or do not provide enough time for a safe street crossing.

127.    Mr. Smith regularly encounters many APS devices that do not function properly and do not inform him when it is safe to cross. For instance, Mr. Smith frequently encounters APS with very low volume that cannot be heard over the traffic noise. When the APS is not working or is not loud enough to be heard over ambient noise, he is unable to use the APS device to know when it is safe to cross the street.

128.    Without properly functioning APS devices, Mr. Smith has difficulty navigating traffic circles, complex intersections, and multi-lane roads, such as Constitution Avenue and the intersection of Benning Road NE and Bladensburg Road NE, where the width of the street and signal timing make it challenging for him to cross safely.

129.    Where an intersection is not equipped with a working APS device, Mr. Smith relies on a number of methods when crossing the street, none of which adequately protect his safety. These methods include listening to the sound of parallel traffic, avoiding certain street intersections, and relying on his navigation training and cardinal directions to orient himself. These methods are unsafe and a drain on Mr. Smith's energy and general ability to accomplish his tasks safely and without undue stress.

130.    Mr. Smith especially experiences frustration and difficulty crossing intersections without properly functioning APS devices at non-traditional four-way intersections, including Washington Circle, a busy traffic circle connecting eight (8) roadways; Massachusetts Avenue NW and H Street NW, a non-traditional skewed intersection; North Capitol Street NE and New

York Avenue NE, a non-traditional skewed intersection with a median refuge island; and Scott Circle, a busy traffic circle near Dupont Circle connecting five (5) roadways.

131.    Many of the intersections Mr. Smith regularly encounters are in high-traffic areas traveled by thousands of pedestrians and vehicles. As such, they are noisy and complex in their design, featuring multiple traffic lanes and directions. The additional noise and activity make it difficult to rely on the sound of parallel traffic to safely navigate across the street, especially when the intersections are not equipped with APS devices or with an APS device that emits an audible tone loud enough to signal to him when it is safe to cross the street.

132.    Taken together, these experiences reflect Mr. Smith's longstanding struggle with access barriers resulting from the systemic lack of properly functioning APS devices in the District. Because he will continue to require accessible pedestrian signals in order to navigate the District safely and independently, the lack of effective APS will affect his daily life for the foreseeable future.

### Plaintiff Claire Stanley

133.    Plaintiff Claire Stanley has been blind since she was nine years old. Since 2008, she has relied on a guide dog for mobility assistance.

134.    Ms. Stanley lives in Rockville, Maryland and works at the American Council of the Blind in Alexandria, Virginia. She previously lived in the District, and regularly travels throughout Washington, D.C. to lobby on Capitol Hill, as well as for social, professional, and cultural events.

135.    In the course of all these activities, Ms. Stanley regularly encounters many intersections in the District that lack APS altogether, or installed APS where signals are broken, malfunctioning, or are not audible, making it difficult to navigate and safely cross the street.

136.    Ms. Stanley regularly encounters APS where the locator tone cannot be heard, preventing her from locating the device altogether. In these situations, she has extreme difficulty engaging with the APS device at all and must either backtrack to go to a different intersection that has a functioning APS device or risk her life crossing the street without knowing if it is safe.

137.    The absence of properly functioning APS devices renders many intersections inaccessible to Ms. Stanley because they are too dangerous to cross. Ms. Stanley experiences great apprehension and frustration about crossing intersections without properly functioning APS devices, especially at non-traditional four-way intersections, such as Dupont Circle, a busy, noisy and complicated confluence of ten (10) roadways, with pedestrian crossings around the perimeter and across the center of the circle.

138.    Ms. Stanley frequently uses other signalized intersections that are similarly noisy and complex in design when navigating her way to various daily destinations.

139.    To cross signalized intersections without APS, Ms. Stanley relies on several methods, none of which adequately protect her safety. These methods include listening for traffic moving in the same direction as her, asking strangers for assistance, crossing in packs of people, and avoiding certain street intersections altogether, including by doing the following: taking buses and cabs in situations where sighted pedestrians could safely walk; getting off buses and subways one or two stops early or late; walking blocks out of her way to her destination to avoid dangerous intersections; and waiting at intersections for several signal cycles before crossing. These methods are unsafe and they drain Ms. Stanley's energy, financial resources, and ability to accomplish everyday tasks safely and without undue stress.

140.    Taken together, these experiences reflect Ms. Stanley's longstanding struggle with access barriers resulting from the systemic lack of properly functioning APS devices in the

District. Because she will continue to require accessible pedestrian signals in order to navigate the District safely and independently, the lack of effective APS will affect her daily life for the foreseeable future.

### CLASS ACTION ALLEGATIONS

141.    Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, Individual Plaintiffs bring this action for injunctive and declaratory relief on their own behalf and on behalf of all similarly situated persons for injunctive and declaratory relief. Individual Plaintiffs seek to represent a class of all blind pedestrians who use the District's signalized intersections. Individual Plaintiffs seek no monetary damages.

142.    The persons in the class are so numerous that joinder is impracticable. Over 14,000 District residents have visual disabilities,[33] and this does not even include the tens of thousands of pedestrians with visual disabilities who regularly visit the District. A class action is accordingly the most efficient vehicle for adjudicating claims of these proposed class members.

143.    In addition to being numerous, proposed class members share a well-defined community of interests with respect to both questions of law and fact at the center of this litigation. All proposed class members' access to the pedestrian grid are subject to the same policy and practice: Defendant's policy and practice for installing, programming, and maintaining APS. Some of those key common questions, which are capable of class-wide resolution, include:

    a.    What Defendant's policy is for installing APS across the District's

            pedestrian grid;

---

[33] *See District of Columbia*, Disability Stats., https://www.disabilitystatistics.org/acs-census?indStat=1#map (last accessed Apr. 15, 2025) (defining "visual disability" as someone who is blind or has serious difficulty seeing even when wearing glasses).

> b.   Whether Defendant is installing APS with sufficient speed to make the pedestrian grid accessible to blind pedestrians;
>
> c.   Whether Defendant is properly programming and maintaining APS units that have been installed in the District such that blind pedestrians can effectively use them;
>
> d.   Whether Defendant is following national standards when installing, programming, and maintaining APS;
>
> e.   Whether Defendant has violated the ADA, Section 504, and the DCHRA by failing to provide access to signalized intersections for blind pedestrians; and
>
> f.   Which remedial scheme is appropriate to rectify blind pedestrians' lack of access to the pedestrian grid.

144.   Individual Plaintiffs' claims are typical of the claims of the class because all Individual Plaintiffs are similarly affected by Defendant's failure to provide access to its signalized intersections for blind pedestrians.

145.   Individual Plaintiffs are adequate class representatives because they are directly impacted by Defendant's failure to equip otherwise signalized intersections with APS units. Moreover, Individual Plaintiffs' claims are typical of the claims of the class because Individual Plaintiffs and the class are all similarly affected by the systemic lack of APS units.

146.   Individual Plaintiffs' interests are not antagonistic, or in conflict with, the interests of the class. The attorneys representing the class are highly trained, duly qualified, and very experienced in representing plaintiffs in civil rights class actions for injunctive relief,

including actions challenging barriers to access involving pedestrian rights-of-way generally and signalized intersections for blind pedestrians in particular.

147.    By failing to ensure access to its pedestrian signals program consistent with federal and local disability access laws, Defendant has acted and/or failed to act on grounds generally applicable to the class. Accordingly, an award of appropriate declaratory and injunctive relief with respect to the class as a whole is warranted in this case.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Discrimination in Violation of Title II of the Americans with Disabilities Act
### 42 U.S.C. § 12131 *et seq.*

148.    Plaintiffs re-allege and incorporate all previously alleged paragraphs.

149.    Title II of the Americans with Disabilities Act prohibits a public entity from excluding a person with a disability from participating in, or otherwise benefitting from, a program of the public entity, or otherwise discriminating against a person on the basis of disability. 42 U.S.C. § 12132. In particular, Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.*

150.    The term "disability" includes "physical and mental impairment[s] that substantially limit[] one or more major life activities." 42 U.S.C. § 12102(2).

151.    A "qualified individual with a disability" is an "individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

152.     Individual Plaintiffs and members of DCCB have vision-related disabilities that substantially limit the major life activity of seeing and, accordingly, are individuals with disabilities within the meaning of 42 U.S.C. §§ 12102 and 12131; *see also* 28 C.F.R. § 35.104. In addition, Individual Plaintiffs and DCCB members are "qualified" as they live, work, or otherwise spend time in the District and regularly navigate its signalized intersections.

153.     A "public entity" includes a state and local government, its agencies, and instrumentalities. 42 U.S.C. § 12131(1). Defendant is a unit of local government and therefore a public entity within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.

154.     Defendant is required to operate each of its programs, services, or activities so that, "when viewed in its entirety, [that program, service, or activity] is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a); *see also* 42 U.S.C. § 12132; 42 U.S.C. § 12134; 28 C.F.R. §§ 35.149, 35.151.

155.     Defendant's pedestrian signals program, including the installation, programming, and maintenance of its pedestrian signals, is a program, service, or activity within the meaning of Title II. *See Am. Council of Blind of Metro. Chicago v. City of Chicago*, 667 F. Supp. 3d 767, 775 (N.D. Ill. 2023).

156.     The ADA requires Defendant to design and construct all new facilities (dating from 1992 onward) to be readily accessible to and usable by people with disabilities. 28 C.F.R. § 35.151(a)(1). Defendant has violated and continues to violate this requirement by failing to install APS when constructing new pedestrian signals since 1992.

157.     The ADA requires Defendant to make alterations to existing facilities such that they are readily accessible to and usable by people with disabilities. 28 C.F.R. § 35.151(b)(1). Defendant has violated and continues to violate this requirement by failing to install APS devices

while replacing existing pedestrian signals or otherwise altering signalized intersections since 1992.

158.    The ADA requires Defendant to provide qualified individuals with disabilities equal and effective opportunities to participate in or benefit from its programs, services, and activities. 28 C.F.R. § 35.130(b)(1)(i)–(iii). Defendant has violated and continues to violate this requirement by denying qualified individuals with disabilities the opportunity to participate in or benefit from its pedestrian signals program; denying qualified individuals with disabilities access to the key safety information pedestrian signals emit; depriving qualified individuals with disabilities the opportunity to participate in the public safety benefits offered by the signals on the same terms as sighted pedestrians; and/or providing individuals with disabilities with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result or to gain the same benefit from the public safety information pedestrian signals convey as provided to others.

159.    The ADA restricts Defendant from directly and/or through contractual or other arrangements utilizing criteria and/or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of that disability and/or defeating or substantially impairing the accomplishment of the objectives of the entity's program with respect to individuals with disabilities. 28 C.F.R. § 35.130(b)(3)(i)–(ii). Defendant has violated and continues to violate this requirement by subjecting qualified individuals to discrimination on the basis of their disability through their administration of the District's pedestrian signal program.

160.    The ADA requires Defendant to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the

basis of disability, unless such would be a fundamental alteration of the public entity's service, program, or activity. 28 C.F.R. § 35.130(b)(7)(i). Defendant has violated and continues to violate this requirement by failing to modify its policies, practices, or procedures to avoid discriminating against blind pedestrians.

161.    The ADA requires Defendant to maintain in good working conditions the features of facilities and equipment that are required for the facilities or equipment to be accessible to people with disabilities. 28 C.F.R. § 35.133(a). Defendant has violated and continues to violate this requirement by failing to properly maintain APS units installed at signalized intersections in good working order.

162.    The ADA requires Defendant to take appropriate steps to ensure that communications with people with disabilities are as effective as communications with others. 28 C.F.R. § 35.160(a)(1). Defendant has violated and continues to violate this requirement by failing to communicate public traffic, warning, and safety information to blind pedestrians as effectively as for sighted pedestrians.

163.    As a direct and proximate result of Defendant's actions or lack thereof, Plaintiffs have been and continue to be injured.

164.    Defendant's conduct constitutes an ongoing and continuous violation of Title II of the ADA, entitling Plaintiffs to declaratory and injunctive relief as well as reasonable attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**<u>Discrimination in Violation of Section 504 of the Rehabilitation Act</u>**
**29 U.S.C. § 794**

165.    Plaintiffs re-allege and incorporate all previously alleged paragraphs.

166.    Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

167.    An "individual with a disability" is defined, in pertinent part, as an "individual" who has "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102 (incorporated by 29 U.S.C. § 705(9)(B)). A "qualified" person with a disability is a person who meets the essential eligibility requirements for participation in, or receipt of benefits from, that program or activity. 28 C.F.R. § 39.103.

168.    Individual Plaintiffs and DCCB members are qualified individuals with disabilities as they have vision-related disabilities that substantially limit the major life activity of seeing. In addition, Individual Plaintiffs and DCCB members are "qualified" as they live, work, or otherwise spend time in the District and regularly navigate its signalized intersections. *See* 29 U.S.C. § 705(9)(B) (referencing 42 U.S.C. § 12102); *see also* 28 C.F.R. § 39.103.

169.    Defendant is required to comply with Section 504 because it is a recipient of federal financial assistance and has been at all times relevant to the claims asserted in this Complaint.

170.    Defendant has violated, and continues to violate, Section 504 and its implementing regulations by excluding Plaintiffs from participation in, denying Plaintiffs the benefits of, and subjecting Plaintiffs, based solely by reason of their disabilities, to discrimination in access to the key public safety information provided by the pedestrian signals.

171.    Defendant has violated, and continues to violate, Section 504 and its implementing regulations by failing to communicate public traffic, warning, and safety information to blind pedestrians as effectively as for sighted pedestrians.

172.    Such acts and omissions violate the equal access and nondiscrimination provisions of Section 504, causing ongoing injury to Plaintiffs. Unless enjoined, such conduct will continue to result in injuries for which Plaintiffs have no adequate remedy at law.

173.    Accordingly, Plaintiffs are entitled to injunctive relief and reasonable attorneys' fees, expenses, and costs, pursuant to 29 U.S.C § 794(a).

**THIRD CAUSE OF ACTION**
**Discrimination in Violation of the D.C. Human Rights Act**
**D.C. Code § 2-1401.01 *et seq.***

174.    Plaintiffs re-allege and incorporate all previously alleged paragraphs.

175.    The DCHRA mandates that "every individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the District and to have an equal opportunity to participate in all aspects of life, including, but not limited to, employment, places of public accommodation, resort or amusement, educational institutions, public service, and housing and commercial space accommodations." D.C. Code § 2-1402.01.

176.    Section 2-1402.73 of the DCHRA prohibits the District from discriminating against individuals with disabilities. In particular, this section provides: "Except as otherwise provided for by District law or when otherwise lawfully and reasonably permitted, it shall be an unlawful discriminatory practice for a District government agency or office to limit or refuse to provide any facility, service, program, or benefit to any individual on the basis of an individual's actual or perceived: . . . disability[.]" D.C. Code § 2-1402.73.

177.    Disability is in turn defined as "a physical or mental impairment that substantially limits one or more of the major life activities of an individual having a record of such an impairment or being regarded as having such an impairment." D.C. Code § 2-1401.02(5A).

178.    Individual Plaintiffs and members of DCCB are persons with disabilities within the meaning of the statute because they have vision-related disabilities that substantially limit the major life activity of seeing.

179.    Defendant is "a District government agency or office" within the meaning of the DCHRA's § 2-1402.73.

180.    Defendant has violated, and continues to violate, the DCHRA by limiting or refusing to provide Plaintiffs, based on their disability, the key public safety information provided by its pedestrian signals.

181.    The criteria and methods utilized by Defendant when installing, programming, and maintaining pedestrian street crossing signals have had the effect of denying blind pedestrians access to the benefit of the key safety information that pedestrian signals otherwise provide for sighted pedestrians.

182.    The District's actions accordingly violate the DCHRA's mandate prohibiting discrimination against persons with disabilities. D.C. Code § 2-1402.73.

183.    Defendant's failure to equip signalized intersections with APS units constitutes failure to reasonably modify current policies and practices with respect to its pedestrian signals' management and installation, thereby denying blind pedestrians full and equal benefit of access to the key public safety information pedestrian signals convey. D.C. Code § 2-1402.73.

184.    Defendant's conduct constitutes an ongoing and continuous violation of the DCHRA. Unless restrained from doing so, Defendant will continue to violate said law, and its conduct will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.

185.    Consequently, Plaintiffs are entitled to injunctive relief, as well as to reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

186.    Declare that the actions and inactions described herein violate the rights of Plaintiffs under Title II of the ADA, 42 U.S.C. § 12131 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and the DCHRA, § 2-1402.01 *et seq.*;

187.    Issue an order requiring Defendant to take the steps necessary to ensure the systemic remediation of signalized intersections within the District so that signalized intersections are equipped with properly installed, programmed, and maintained APS devices as needed to comply with the ADA, Section 504, and the DCHRA;

188.    Issue an order enjoining Defendant from continuing to engage in the unlawful conduct of installing or substantially altering pedestrian signals without providing for APS technology;

189.    Award reasonable attorneys' fees and costs; and

190.    Grant such other and further relief as the court deems just and proper.


Dated: May 29, 2025                         Respectfully submitted,
       Washington, D.C.


                                            /s/_____
                                            Michael Allen (D.C. Bar No. 409068)
                                            Jennifer Klar (D.C. Bar No. 479629)
                                            Robert Hunter (D.C. Bar No. 90031794)

RELMAN COLFAX PLLC
1225 19th Street NW, Suite 600
Washington D.C. 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
mallen@relmanlaw.com
jklar@relmanlaw.com
rhunter@relmanlaw.com

Kaitlin Banner (D.C. Bar No. 1000436)
Chelsea Sullivan (D.C. Bar No. 90017708)
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS AND URBAN AFFAIRS
700 14th Street NW, Suite 400
Washington, D.C. 20005
Phone: (202) 319-1000
Fax: (202) 319-1010
kaitlin_banner@washlaw.org
chelsea_sullivan@washlaw.org

Rachel Weisberg (*pro hac vice* pending)
DISABILITY RIGHTS ADVOCATES
300 South Wacker Drive, Floor 32
Chicago, IL 60606-6680
Tel: (332) 217-2319
Fax: (212) 644-8636
rweisberg@dralegal.org

Erin Gallagher (*pro hac vice* pending)
DISABILITY RIGHTS ADVOCATES
655 Third Avenue, Suite 2619
New York, NY 10017-5621
Tel: (332) 217-2297
Fax: (212) 644-8636
egallagher@dralegal.org